**RECEIVED**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAY 27 2008
MAY 27 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

United States of America ex rel.                    )

Randy Walker, Register No. N–54451,

    Petitioner

        vs.

**08CV3052**

**JUDGE ZAGEL**

**MAGISTRATE JUDGE KEYS**  )

Yolande Johnson, Warden                              )
Vienna Correctional Center                           )
                      )
    Respondent                                     )
                      )     Case Number of State Court Conviction:
                      )
                      )     96 CR 25404

**PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY**

1.    Name and location of court where conviction entered:    Circuit Court of Cook County, Chicago, Illinois.

2.    Date of judgment of conviction:    November 16, 1998

3.    Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)

    Possession of a controlled substance with intent to deliver, 96 CR 2540401

4.    Sentence(s) imposed:    24 years

5.    What was your plea?  (Check one)      (A)  Not guilty    ( x )
                                                 (B)  Guilty        ( )
                                                   (C)  Nolo contendere    ( )

    If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

Revised: 7/20/05

## PART I – TRIAL AND DIRECT REVIEW

1.  Kind of trial: (Check one):        Jury  (x)              Judge only  (  )

2.  Did you testify at trial?          YES  (  )            NO      ( x )

3.  Did you appeal from the conviction or the sentence imposed? YES ( x )   NO (  )

    (A)  If you appealed, give the

        (1)   Name of court:   Appellate Court of Illinois, First District

        (2)   Result:          Affirmed

        (3)   Date of ruling:   August 23, 1999

        (4)   Issues raised:    a) whether it was error to consider Petitioner's flight from his jury trial an

aggravating circumstance; b) whether Petitioner's 24-year sentence was excessive.

    (B)  If you did not appeal, explain briefly why not:

    _____

    _____

4.  Did you appeal, or seek leave to appeal, to the highest state court?   YES (  )          NO (x)

    (A)  If yes, give the

        (1)   Result:        _____

        (2)   Date of ruling:   _____

        (3)   Issues raised:    _____

    _____

    _____

    (B)  If no, why not:   _____

5.  Did you petition the United States Supreme Court for a writ of *certiorari*?   Yes (  )   No (x)

    If yes, give (A) date of petition: _____  (B) date *certiorari* was denied:      _____

2

## PART II – COLLATERAL PROCEEDINGS

1.  With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

    YES ( x )   NO ( )

    With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

    A. Name of court: Circuit Court of Cook County, Illinois

    B. Date of filing:   September 2004

    C. Issues raised:

    (1)     denial of due process and effective assistance of trial counsel where counsel failed to request a fitness hearing or investigate Petitioner's fitness to stand trial, or, alternatively, to present evidence of Petitioner's poor mental health as a mitigating circumstance at sentencing

    (2)     denial of due process and effective assistance of counsel at resentencing for failure to request a fitness hearing, investigate Petitioner's mental history or obtain readily accessible information concerning Petitioner's mental health history;

    (3)     ineffective assistance of appellate counsel for failing to argue that there was a *bona fide* doubt of Petitioner's fitness;

    (4)     denial of due process the trial court erred in failing to order a fitness hearing, despite Petitioner's odd behavior and other evidence indicating a *bona fide* doubt regarding Petitioner's fitness to stand trial or be resentenced.

    (5)     The untimeliness of Petitioner's post-conviction petition should be excused because he was not culpably negligent in filing the petition late, due to his mental illness and incorrect advice of counsel.

    D. Did you receive an evidentiary hearing on your petition?          YES ( )   NO (x)

    E. What was the court's ruling?        post-conviction petition dismissed

    F. Date of court's ruling:        September 2, 2005

    G. Did you appeal from the ruling on your petition?          YES ( x )   NO ( )

    H. (a)     If yes, (1) what was the result?     affirmed

                    (2) date of decision:     September 27, 2007

        (b)     If no, explain briefly why not:

Revised: 7/20/05

I.   Did you appeal, or seek leave to appeal this decision to the highest state court?

YES (x )    NO ( )

(a)    If yes, (1) what was the result?    petition for leave to appeal denied

(2) date of decision:        January 31, 2008

(b)    If no, explain briefly why not:

_____

_____

_____

_____

_____

_____

_____

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?        YES ( )        NO (x)

A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

1.    Nature of proceeding        ____ _____ _____

2.    Date petition filed          _____ ___ _ _____

3.    Ruling on the petition       _____ ___ ___ _____

4.    Date of ruling              _____ _ _____ ___

5.    If you appealed, what was
      the ruling on appeal?        _____ __ _____

6.    Date of ruling on appeal     __ _____

7.    If there was a further appeal,
      what was the ruling ?        _____ _ _____

8.    Date of ruling on appeal     _____ ___ _____

3.   With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?    YES ( )    NO (x)

A. If yes, give name of court, case title and case number:

_____

_____

4

Revised: 7/20/05

B. Did the court rule on your petition? If so, state

   (1) Ruling: _____

   (2)   Date:          _____

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?    YES ( )        NO (x)

   If yes, explain:

   _____

   _____

   _____

   _____

   _____

   _____

   _____

## PART III – PETITIONER'S CLAIMS

1.   Statement of Facts and Grounds for Relief

### STATEMENT OF FACTS RELATED TO WALKER'S CLAIMS

**Trial Proceedings**

In 1996, Walker was charged with possession of a controlled substance with intent to deliver and delivery of a controlled substance, based on his possession and sale of, respectively, .2 and .27 grams of cocaine. (Supp. C. 644-45) Walker, represented by Anthony Basile (since suspended by this Court, elected to be tried by jury. As the parties met to exercise challenges to the panel members, Walker began wandering around the courtroom. When asked by the judge if wanted to remain, Walker replied that he did not, that he would let his lawyer "handle it." (Supp. C. 819) Walker then left the courtroom and went to Minnesota. He did not return for the rest of his trial. The jury found Walker guilty on both counts and the trial court sentenced Walker in absentia to the Class X maximum of 30 years'

Revised: 7/20/05

imprisonment. (Supp. C. 719) Walker was subsequently arrested in Minnesota and returned to Cook County. When he appeared in front of the trial judge on May 7, 1998, Walker's new attorney, Marcella Lipinski, immediately requested a Behavioral Clinical Exam (BCX). (Supp. C.970-71, TC. 11)

### Forensic Clinical Services Evaluations

#### Clinical Social Work Summary [June 1, 1998]

Social worker Janine Bostick prepared a Clinical Social Work Summary based on a telephone interview with Walker's girlfriend, Tracy Hayes. Hayes told Bostick that Walker had, in the past, "taken medication for his mind" and had been admitted to a psychiatric hospital 5 or 6 years ago. Hayes told Bostick that Walker had likely taken part in outpatient therapy. (Supp. C. 592-93) Hayes stated that one year prior, Walker started experiencing visual hallucinations involving people and dogs. During that same time, Walker started talking to himself and hearing voices. (Supp. C. 593) Hayes reported that Walker "thinks [family members] and people in general are out to get him." (Supp. C. 594) Hayes told Bostick that Walker received SSI benefits "because something is wrong with his mind and he is close to retarded." (Supp. C. 594)

### Forensic Clinical Services Psychiatric Summary [June 3, 1998]

Dr. Haidari Shikari performed a court-ordered BCX on Randy Walker. According to the BCX report, Shikari reviewed Bostick's clinical social work summary, among other documents. (Supp. C. 584) Walker told Shikari that he "lost faith in his attorney and in the system" the first day of his trial and so decided to go visit his son in Minnesota. (Supp. C. 584) Walker also told Shikari that he was trying to become an informant so he could get some leniency with his case. According to Shikari, Walker was able to define various legal terms and describe the roles of the judge, state's attorney and defense attorney. (Supp. C. 585) Shikari concluded from this that Walker was capable of assisting his lawyer in his defense and was fit to stand trial. (Supp. C. 585-86) Walker also told Shikari that an undercover police officer planted cocaine on him and arrested him because Walker was unable to tell the officer where guns could be bought. (Supp. C. 585) Because Walker was able to "plausibly" describe the events leading to his arrest, concluded Shikari, Walker was therefore legally sane at the time of the offense.

6

(Supp. C. 585)

### Motion for New Trial and to Vacate Sentence

Walker's new attorney filed a motion for a new trial (denied) and a motion to vacate sentence. (Supp. C. 964) At the hearing on the motion to vacate sentence, Walker's lawyer stated that she had ordered a BCX because she could sense the "mental distress and emotional stress he was under at that time." (Supp. C. 971) The court granted the motion. (Supp. C. 975)

### Walker's Statement in Allocution at Resentencing Hearing

After argument in mitigation and aggravation, Walker spoke on his own behalf. Walker told the judge that he had fled his trial because of threats against his life. (Supp. C. 983) According to Walker, the Cook County State's Attorney "would also acknowledge that I'm involved in a lot of different situations where a lot of officials that's doing the selling drugs, they are selling guns, they are doing all that and the federal prosecutor got in touch with the [Cook County state's attorney] about trying to get me up out of the situation." (Supp. C. 983)

Walker also stated that he had to turn in his attorney, Anthony Basile, for shooting a nine-year old girl. (Supp. C. 983) Walker said that Basile would have "set him up" if Walker had complained of his representation. (Supp. C. 984) Walker also said h7e was tired of the police visiting him in Cook County Jail, "wanting to get me out to go undercover to catch some more police." (Supp. C. 986) He urged the judge to call a "Mr. Peters" at telephone number 429227 "and talk to the feds." (Supp. C. 986)

Walker told the court he was disabled and that he paid Basile $200 from each $400 SSI check. (Supp. C. 991) Walker stated, "Basile, he was out there selling drugs and guns with the gang. If I didn't turn him in he would have died. So I did that." (Supp. C. 993) Walker indicated that he had written the judge four letters explaining "everything that was going on ..." (Supp. C. 995) The judge then took a recess and read the letters. (Supp. C. 996) When he returned, the judge continued the sentencing hearing so Walker could contact the FBI and have the FBI call the judge. (Supp. C. 997-98)

### Walker's Letters to Trial Judge Thomas Davy

In the first letter, dated May 13, 1998, Walker expressed fear for his wife and children and asked the

Revised: 7/20/05

judge to "see that those people who wronged me are not able to do that again." (Supp. C. 1033) Walker claimed that "two police stations" he helped "set me out to be killed ... ." (Supp. C. 1033) Walker claimed he was assaulted two times (apparently stemming from his activities as an informant) but nevertheless kept coming to court. (Supp. C. 1033-34)

In another letter, dated May 17, 1998, Walker wrote, "I truly believe I used my time out on bond wisely I risked my life to inform against Drug Dealers and criminals ..." (Supp. C. 1035) According to Walker, he could not speak to the judge about these matters because "open court means death for me and my family." He then asked the judge to send somebody to talk to him, "set a wire tap on the phone and Let's Get Mr. Basalle, also that policeman in Harvey who offered me 10% of all confiscated money!" (Supp. C. 1036) Walker also claimed that what he knew about certain people "can get me killed in [jail]." (Supp. C. 1037)

On June 1, 1998, Walker wrote, "Now that you see that everything I said is true now what? Are you going to let me work with those people? I'm sure they have contacted the State's Attorney." (Supp. C. 1039) Walker then states that he's "not at liberty to tell [the judge] what's about to happen, but I can tell you that my part will be vital ..." (Supp. C. 1039) With reference to his ongoing crusade against police corruption, Walker wrote that he was ready to get revenge on "controllers masterminds ... This is something I wanted to do! Ten years ago I told the same people what what was brewing, They didn't listen ... My cry was laughed at, Now my cry is one of truth! I have proof, undeniable proof! I never gave up! I kept gathering information until I got a bigger file than proffesionals." (Supp. C. 1041)

### Walker's Letters to Resentencing Attorney

Walker told resentencing counsel Lipinski that he left his trial because of "fear and a mental breakdown." (Supp. C. 1043) He further claimed that his life was in danger, and went on to claim that he was an informant for the Harvey and Urbana, Illinois police departments. (Supp. C. 1044) Walker claimed to have been pistol-whipped, beaten with a baseball bat and shot at, "all for people I help put in jail." (Supp. C. 1044) Walker also wrote that another (unspecified) agency wanted him to help them and asked Ms. Lipinski to bring the matter to the judge's attention. (Supp. C. 1044) Walker continued, "I

Revised: 7/20/05

have information that people get killed for. I did more work than any public agency would do!" (Supp. C. 1046)

### Resentencing Hearing (con't)

After reviewing the factors in mitigation and aggravation, the judge stated that he had had an opportunity to consider the matters raised in Walker's various letters "which make certain claims which as to his possible involvement with the F.B.I. certain claims which due to a lack of contact by the F.B.I. to me, I don't find actually exist. They exists [*sic*] perhaps only in Mr. Walker's mind." (Supp. C. 1008) The judge then resentenced Walker to 24 years. (Supp. C. 1008)

Walker then spoke up, telling the judge that he receives SSI and has been to Chester Mental Health Center, as well as "Ville Mental Health Center." (Supp. C. 1011) He repeated that he had been at Chester Mental Health Center and added, "I mean, you don't actually have my background." (Supp. C. 1011)

### Direct Appeal

In a letter dated May 18, 1999, Walker told appellate counsel that he had received Social Security for "mental disability" and that that fact was not brought out at his trial. (Supp. C. 1021) Walker stated that he was a police informant in Urbana, Illinois and that he was suffering from "massive head wounds" during his trial which caused him to "blank out and [lose] control of his ability to think." (Supp. C. 1021) Walker wrote another letter to counsel, claiming that the FBI visited him twice in jail, wanting to "use" Walker, but that the State's Attorney would not agree to let Walker work with them. (Supp. C. 1023) The envelope used to send one of these letters contains numerous scribblings, including, "GET THIS PICTURE AND KNOW WHY PICASSO PAINTED UPSIDE DOWN CATHOLIC WEB!" and "INSTEAD OF YAHTZEE LET'S PLAY NAZI." (Supp. C. 1025-26, emphasis in original)

Walker's attorney did not raise the issue of fitness on direct appeal. (Supp. C. 602-08) The appellate court affirmed Walker's conviction and sentence on August 23, 1999. (Supp. C. 600)

### Post-Conviction

In September of 2003, Walker filed a *pro se* post-conviction petition. (C. 13-14) The court

9

appointed counsel and Walker subsequently filed a supplemental post-conviction petition, alleging, *inter alia*, a due process violation based on the presence of a *bona fide* doubt regarding his fitness to be tried and sentenced, as well as ineffective assistance of trial and appellate counsel for failure to raise the issue of Walker's fitness. Attached to the petition were copies of all the letters and reports described above. The petition was also supported by Randy Walker's previous correctional and mental health records, documenting the following:

### Previous Finding of Unfitness/Chester Mental Health Center

In May of 1985, Randy Walker was declared unfit for sentencing and was referred to the Chester Mental Health Center. (Supp. C. 226) Walker believed he was in jail because he failed to act as a "stool pigeon" for the State's Attorney's office. He was also convinced that he was under electronic surveillance and that he had been shot in the back with a laser. (Supp. C. 230) Walker was diagnosed with "paranoia" and "antisocial personality disorder," and, after threatening the staff psychiatrist and other personnel with physical violence, he was prescribed various psychotropic drugs, including Prolixin, Decanoate, Cogentin, and Mellaril. (Supp. C. 226-27)

### Admission to Tinley Park Mental Health Center - 1987

During a subsequent stay in Cook County Jail, Walker was referred to the mental health facility at Tinley Park. (Supp. C. 232) Walker denied any history of psychiatric care and stated that the court system was trying to "build up a case against him." He refused to take prescribed medications or participate in any kind of counseling. The staff psychiatrist diagnosed him with atypical psychosis and borderline personality disorder. (Supp. C. 233)

### Social Security Administration

The Social Security Administration determined that Walker was "schizophrenic/paranoid" and suffered from "personality disorder. Walker received SSI disability benefits from 1993 to 2003. (Supp. C. 71-73, attached to amended petition)

### Dixon Correctional Center – 1991

While in prison in 1991, Walker was assigned to Dixon's mental health unit. (Supp. C. 329-31,

Revised: 7/20/05

337) At the time of the psychiatric examination, Walker did not know the date or time. (Supp. C. 337) Walker was described as "acutely psychotic" and was diagnosed with delusional disorder, paranoid type. He was put on an enforced regimen of psychotropic drugs. (Supp. C. 337)

### Dixon Correctional Centers – 1999

In August of 1999, while incarcerated at Centralia, Walker was again transferred to the Dixon psychiatric unit. (Supp. C. 135, 138) According to a report, Walker stated that everyone at Dixon is "left minded" and that prison officials administer medication to make him and everyone else "left minded." (Supp. C. 135) Walker stated that he may kill someone. The psychiatrist subsequently recommended that Walker be admitted as an emergency patient, because of possible "underlying paranoid psychosis." (Supp. C. 135) While at Dixon, Walker continued to refuse recommended psychotropic medications. (Supp C. 137)

### Evaluation Performed by Keenan R. Ferrell, Psy. D.

Dr. Keenan Ferrell evaluated at the request of post-conviction counsel. (Supp. C. 60) According to Dr. Ferrell's report, Walker's paranoid thoughts were "extremely high in frequency and so severe as to likely be delusional." (Supp. C. 66) Ferrell referred specifically to Walker's persistent belief, quite common in schizotypal personality disorders, that the FBI was interested in having Walker assist them with their investigations. (Supp. C. 66) Ferrell wrote, "Mr. Walker is paranoid to that extent that he feels he has many enemies and he usually sees himself as lacking an even minimal support system upon which he can rely." (Supp. C. 67) Dr. Ferrell diagnosed Walker with schizophrenia, paranoid type, personality disorder with paranoid, self-destructive and schizotypal features and mild mental retardation. (Supp. C. 67)

### Ruling on Post-Conviction and Appeal

The State filed a motion to dismiss Walker's petition, and, after a hearing, the court granted the motion. (R. T11) The appellate court affirmed the dismissal, holding that there was "ample evidence" of Walker's fitness to be tried and resentenced. *People v. Walker*, 1-05-3676, Rule 23 Order at 7 (1st Dist., 4th Div., September 27, 2007). The appellate court denied Walker's petition for rehearing. The Illinois

11

Supreme Court denied Walker's petition for leave to appeal.

### GROUNDS FOR RELIEF

**I.  THERE WAS A *BONA FIDE* DOUBT REGARDING RANDY WALKER'S FITNESS TO
STAND TRIAL AND BE RESENTENCED WHERE WALKER EXHIBITED IRRATIONAL
BEHAVIOR DURING THE BRIEF TIME HE ATTENDED HIS TRIAL AND MADE
BIZARRE CLAIMS AT HIS RESENTENCING HEARING, CLAIMS THE JUDGE
STATED "EXISTED ONLY IN WALKER'S MIND." ACCORDINGLY, WALKER WAS
DENIED DUE PROCESS OF LAW WHERE THE TRIAL COURT FAILED TO ORDER A
FITNESS HEARING BEFORE TRYING OR RESENTENCING WALKER**

After one afternoon of *voir dire*, a "crying and depressed" Randy Walker took off for Minnesota.
(Supp. C. 835-883) Seven months later, at his resentencing hearing, Walker made outrageous claims
which should have alerted the trial court of the need for a renewed fitness examination and hearing.
Walker explained that he did not attend his trial because of threats against his life. (Supp. C. 983)
Walker made grandiose claims that he was aware of officials selling drugs and guns, and that a federal
prosecutor had contacted the State's Attorney's office about extricating him from his current case.
(Supp. C. 983) In the course of the same rant, Walker alleged that his trial attorney, Anthony Basile,
would have "set him up" if he had complained about his representation (Supp. C. 984), then later said
that he had turned in Basile for "selling drugs and guns with the gang." (Supp. C. 993) He urged the trial
court to contact a "Mr. Peters" and "talk to the feds," apparently about his imagined involvement in
various federal investigations, and asked the court to read the letters Walker had written to him. (Supp.
C. 986,995) Walker also told the trial court that he was a disabled person receiving SSI. (Supp. C. 991)

Although Walker's delusions should have been apparent at that point, and a fitness hearing ordered,
the judge took a recess to review Walker's letters, three of which were attached to Walker's post-
conviction petition. (Supp. C. 1033-42) The letters contained similar fictitious claims of police
corruption ("If I had a talk with the FBI I'm sure those police would also be in [jail]," Supp. C. 1036)
and grand conspiracy ("[they] set me out to be killed ... " Supp. C. 1033). Walker repeated his claims

12

that he was working as an informant against drug dealers and other criminals but told the judge he could

not speak on the record about his activities, "because open court means death for me and my family."

(Supp. C. 1036) After reading the letters, the judge continued the hearing to give Walker the opportunity

to contact the FBI and have the FBI call the judge. (Supp. C. 996)

Unsurprisingly, the FBI never contacted the judge, prompting the trial court to comment at the next

court date that Walker's claims regarding the FBI exist "perhaps only in Mr. Walker's mind." (Supp. C.

1008) Despite the court's explicit acknowledgment, and copious evidence, that Walker was delusional,

the judge proceeded with the sentencing hearing and resentenced Walker to 24 years' imprisonment.

Walker then informed the judge that he received SSI and had been to Chester and "Ville" mental health

centers, adding, "[Y]ou don't actually have my background." (Supp. C. 1011)

Walker's words and letters reflect a *bona fide* doubt regarding Walker's fitness to stand trial and be

sentenced, and he should have received a fitness hearing. Courts generally look to the following factors

to determine whether a fitness inquiry was warranted: 1) a defendant's behavior and demeanor during

court proceedings, 2) a defendant's psychiatric history; 3) whether defendant is being administered

psychotropic medication; 4) counsel's and/or the trial court's observations regarding defendant's

competency; and 5) medical opinion

With regard to factor one, Walker's paranoid and grandiose statements at allocution and letters to

the judge should certainly have alerted the court to the possibility that Walker was not fit. Further

Walker told the court outright, after sentence was imposed, that he had been receiving SSI and had been

treated at two different mental health centers. (Supp. C. 1011) Significantly, sentencing counsel Lipinski

immediately requested a BCX on the same day she was appointed to represent Walker, based on her

assessment of Walker's "mental distress and emotional stress he was under at the time." (Supp. C. 970-

71, Supp. C. 675) And, as if that was not enough, the trial court specifically found that Walker's claims

about his undercover involvement with the FBI were a figment of his imagination. (Supp. C. 1008)

These delusions, preceded with Walker's abrupt flight from his trial, were more than sufficient to raise a

*bona fide* doubt regarding Walker's fitness to stand trial and be sentenced.

13

Here, where Walker 1) entertained obviously paranoid/grandiose delusions and made them known to the trial court both orally and in writing, 2) informed the trial court that he had been treated at mental institutions, and 3) was receiving SSI (and exhibited no obvious physical disability) , the trial court should have realized that the BCX was neither complete nor accurate, the court should have ordered further inquiry into Walker's fitness. Failure to do was a violation of due process.

## II. RANDY WALKER RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL, RESENTENCING AND APPELLATE COUNSEL WHERE HIS REPRESENTATIVES FAILED TO REQUEST A FITNESS HEARING, OR RAISE THE ISSUE OF HIS FITNESS, DESPITE COPIOUS EVIDENCE OF WALKER'S PARANOID DELUSIONS AND BIZARRE BEHAVIOR.

Randy Walker's lawyers did not fulfill their duty to their client. Walker's insistence on leaving his jury trial and subsequent flight to Minnesota, coupled with his bizarre comments made at both phases of his resentencing hearing, should have alerted counsel to Walker's mental illness, and prompted one, or both of them, to move for a fitness determination. In addition, because Walker's behavior and comments were evident from the direct appeal record, appellate counsel should have raised the trial lawyers' failure to move for a fitness hearing at the direct appeal stage. These lawyers' studied ignorance of Walker's obvious mental illness, and failure to ensure that Walker was fit to be tried and/or sentenced, constituted ineffective assistance of counsel.

### A. Now-Disbarred Trial Attorney Anthony Basile was Ineffective for Failing to Investigate Walker's Mental Health History and/or Request That Walker Be Evaluated for Fitness to Stand Trial.

Anthony Basile was Randy Walker's trial attorney. Prior to Basile's 2000 suspension by the Illinois Supreme Court, (Supp. C. 581), he represented Walker on charges of delivery of a controlled substance and possession of a controlled substance, both involving small amounts of cocaine. (Supp. C. 913-14) Although there were several indications that Walker was mentally ill and should have been evaluated for fitness, Basile failed to request a fitness hearing. For this reason, Walker received constitutionally

Revised: 7/20/05

deficient representation.

Randy Walker's behavior during voir dire should have alerted Basile to Walker's mental problems. When the parties met to exercise challenges for cause, Walker apparently began to wander around the courtroom. The ASA stated, "I would ask that the defendant remain in the courtroom and not be wandering about." The judge informed Walker that he had a right to be present for the proceedings, and admonished him not to speak to any jurors, who were standing out in the hallway. Walker replied, "I don't want to stay, sir. I will let him handle it." (Supp. C. 819) Walker then left the courtroom, and failed to appear for court the next day. When the trial court asked Basile where his client was, Basile told him that he had spoken to Walker's girlfriend, who reported that he had called the day before, "crying and depressed," saying he was not coming back to the trial. (Supp. C. 835-36) Basile never moved for a fitness hearing, or made the slightest suggestion that Walker's behavior was due to mental illness. Walker was tried in absentia and sentenced, initially, to the maximum Class X term of 30 years. (Supp. C. 719) At the sentencing hearing, Basile described Walker's absence as "indefensible," presented no mitigating evidence, and then withdrew from the case after sentence was imposed. (Supp. C. 955, 959)

Basile's failure to request a Behavioral Clinical Examination (BCX), much less a fitness hearing, is not surprising, considering the chaotic state of Basile's own life. Records from Basile's ARDC disciplinary proceedings, attached to Walker's supplemental post-conviction petition, reveal that at the time Basile was representing Walker, he used cocaine every day and marijuana frequently. (Supp. C. 554) Basile was diagnosed as HIV positive in 1996, and, at the time he was examined by a psychiatrist in 2000, Basile reported increasing loss of memory and confusion. (Supp. C. 555-56) Because of Basile's drug addiction and worsening health, he chronically failed to appear in court and was cited for contempt seven times between 1996 and 1999 – the same time he was representing Walker. (Supp. C. 531-40, Supp. C. 629-32) Basile exhibited a similar pattern of conduct in Walker's case by failing to appear on four scheduled court dates, on one occasion offering the explanation that his car had been booted. (Supp. C. 630-31) This excuse is as far-fetched as the ones offered in other cases on which he failed to

Revised: 7/20/05

appear. (Supp. C. 555, "a severe storm knocked out the power," "my roommate took the car and I couldn't get a cab," "I got robbed, tied up and bound.")

The psychiatrist who examined Basile at the behest of the ARDC described Basile as *"globally impaired,"* based on his long-term chronic use of crack cocaine and AIDS-related dementia. (Supp. C. 559, emphasis in original). As noted by the psychiatrist, cocaine alters concentration, attention and judgment, and a lawyer who uses this drug "could not be reasonably expected to consistently exercise the due diligence his clients expect of him." (Supp. C. 558) In light of these particular circumstances, Basile's failure to request a fitness hearing may not be characterized as strategy.

Competent counsel would have requested a fitness hearing to determine Walker's fitness to stand trial, particularly after Walker's behavior in court. Wandering around the courtroom, absenting one's self from a crucial moment in *voir dire* and leaving the jurisdiction mid-trial are not the acts of a rational person. Of course, Basile's failure to act must necessarily be viewed through the prism of Basile's own "global[] impair[ment]," which undoubtedly affected Basile's ability to accurately assess the situation. (Supp. C. 559)

**B. Randy Walker Received Ineffective Assistance of Counsel Where the Attorney Appointed to Represent Him at Resentencing Failed to Conduct any Investigation into Walker's Mental Health History, an Inquiry Which Would Have Produced Substantial Mitigating Evidence for Use at Sentencing, or Request a Fitness Hearing.**

Former Assistant Public Defender Marcella Lipinski represented Walker after his return to Cook County. Perceiving what she later described as Walker's "emotional stress," she immediately requested a BCX. (Supp. C. 635, Supp. C. 970-71) The referral order requested a fitness determination for trial as well as sentencing. (Supp. C. 584) Lipinski was present when Walker made his bizarre clams in allocution and after sentencing. (Supp. C. 962, 982-94,1000, 1010-11) She, like the trial court, received delusional letters from Walker, describing his obviously fictitious informant activities and persecution at the hands of drug dealers. (Supp. C. 1043-47) Competent counsel, armed with this information, would have obtained Walker's mental health and incarceration records, none of which were submitted to a

16

court or Dr. Shikari, the Forensic Clinical Services psychiatrist. Walker's bizarre behavior and comments should also have prompted counsel to move for a fitness hearing, instead of blithely accepting Shikari's dubious conclusion that Walker was fit for sentencing. Had she fulfilled her duty to her client, she would have discovered Walker's mental health history, which not only undermines Shikari's finding of fitness, but would also have served as mitigating evidence at resentencing. (Supp. C. 48-49) Attorney Lipinski was ineffective for failing to take these rudimentary steps, and Walker must therefore receive a new trial, or, at the very least, a new sentencing hearing.

Counsel was present for Walker's delusional tirade at sentencing, in which Walker claimed, among other things, that the FBI wanted to use him as an informant and that he had fled his trial because of "threats against [his] life." (Supp. C. 983) Walker also implicated trial counsel Basile in the murder of a nine-year old. (Supp. C. 983) Significantly, Walker told the trial court that he had been in two mental health centers. (Supp. C. 1011) No one in the courtroom paid any attention to Walker's remarks. What happened was obvious: the judge, prosecutor and, most crucially, defense counsel, simply allowed Walker to ramble on, unwilling to interrupt the sentencing hearing to address the key issue in Walker's case: his fitness. Competent counsel, having witnessed this obviously delusional tirade and learning of Walker's previous stay at mental institutions, would not have permitted her client to proceed to sentencing without further inquiry.

At a minimum, evidence of Walker's mental illness could have been cited as a mitigating circumstance at the resentencing hearing. (Supp. C. 48-49) Walker initially received the Class X maximum of 30 years for possession and delivery of a total of .47 grams of cocaine, and mitigating evidence was crucial to securing a lighter sentence for Walker at resentencing. Nevertheless, in spite of Walker's strange letters, in-court ramblings, and the ease of obtaining mental health records, Lipinski failed to conduct any kind of investigation into Walker's past. It is well-established that an attorney has a duty to investigate potential sources of mitigating evidence. Lipinski's failure to conduct such an investigation is a clear breach of that duty.

Walker was entitled to an independent psychiatric evaluation, and competent counsel would have

17

conducted such an investigation into her client's mental health history. Here, the need for another evaluation was apparent, and effective counsel would not have been satisfied with Shikari's determination that Walker was not only fit but suffered from "no mental disorder," a startling conclusion indeed, considering Walker's in-court behavior and delusional letters. (Supp. C. 586) Counsel's failure to move for a fitness hearing and/or use Walker's easily-accessible history of mental illness at sentencing constitutes deficient performance.

### C. Basile's and Lipinski's Failure to Request a Fitness Hearing Was Ineffective Assistance of Counsel, Because there is a Reasonable Probability That the Trial Court Would Have Ordered a Fitness Hearing or Further Reduced Walker's Harsh 24-Year Sentence Had He Been Apprised of Walker's Mental Health History and Bizarre Letters to Attorney Lipinski.

To establish prejudice from counsel's failure to request a fitness hearing, a petitioner must show that facts existed at the time of trial which would have raised a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings and assist in his defense. A post-conviction petitioner must be able to show that had the trial court been informed of the evidence that defendant was unfit, it would have found a *bona fide* doubt of fitness and ordered a fitness hearing. As described above, there was abundant on-the-record evidence that Walker was not competent to stand trial or be sentenced. Given Walker's bizarre behavior, noted by the trial court, there is a reasonable probability that the court would have found a *bona fide* doubt as to his competence and held a fitness hearing, had counsel requested one.

In addition, counsel was privy to information that the trial court was not, e.g., Walker's exceedingly odd letters to attorney Lipinski. (Supp. C. 1043-49) These letters demonstrate Walker's paranoia and obsession with conspiracy, well-known hallmarks of paranoia. Walker also attached an affidavit to his petition, stating that he told both Basile and Lipinski about his mental health history. (Supp. C. 1029-30) Walker's attorneys could easily have obtained the type of information presented in Walker's amended post-conviction petition, e.g., his mental health history and/or an independent psychological evaluation. Had counsel brought these materials to the trial court's attention, there is a reasonable

18                                        Revised: 7/20/05

probability that the court would have ordered a fitness hearing.  Walker has thus demonstrated

ineffective assistance of counsel and his conviction should be vacated and this cause remanded for a new

trial, or alternatively for a new resentencing hearing.

There is also a reasonable probability that Walker's mental health history, had it been investigated

and presented by either Basile or Lipinski, would have served to mitigate Walker's original 30-year and

subsequent 24-year sentence, stemming from a minor drug case involving .47 grams of cocaine.

However, because of Basile's and Lipinski's failure to conduct any investigation into Walker's

background, the trial court was unaware of Walker's extensive history of mental illness. This

information, properly presented, would have had a reasonable probability of reducing Walker's harsh

sentence(s) – indeed, the trial court commented at Walker's initial sentencing hearing that, other than the

non-violent nature of the offense, "there does not appear to be any factor in mitigation in the Defendant's

favor." (Supp. C. 958) The resulting prejudice to defendant is clear: had counsel presented evidence of

Walker's well-documented and serious mental illness (which, in Keenan Ferrell's opinion, explained

Walker's sudden flight from trial, Supp. C. 67-68, Supp. C. 94-95), the trial court would have been

aware of substantial mitigating evidence.  The failure to present this evidence raises a serious doubt as to

the reliability of defendant's sentencing.

III.   **RANDY WALKER'S POST-CONVICTION PETITION, SUPPORTED BY
AFFIDAVITS, DR. KEENAN FERRELL'S PSYCHOLOGICAL EVALUATION AND
PSYCHIATRIC HOSPITAL AND IDOC RECORDS DOCUMENTING WALKER'S
DIAGNOSIS AND HISTORY OF SERIOUS MENTAL ILLNESS, MADE A
SUBSTANTIAL SHOWING THAT WALKER WAS DENIED DUE PROCESS AS WELL
AS THE EFFECTIVE ASSISTANCE OF COUNSEL BY THE TRIAL JUDGE'S
FAILURE TO *SUA SPONTE* ORDER A FITNESS HEARING AND WALKER'S
ATTORNEYS' SERIAL FAILURE TO ADDRESS THE ISSUE OF WALKER'S
FITNESS.**

Randy Walker's supplemental petition for post-conviction relief is supported by copious

19

Revised: 7/20/05

documentation supporting Walker's claims that he was denied due process and his right to the effective assistance of trial, sentencing and appellate counsel. (Supp. C. 40-55) In addition to attaching the record of proceedings, which contains all of Walker's bizarre, paranoid remarks (Supp. C. 734-1017), Walker also submitted an affidavit and psychological evaluation prepared by Dr. Keenan Ferrell at the request of post-conviction counsel. (Supp. C. 60, Supp. C. I, 94-96) Dr. Ferrell, unlike the psychiatrist who concluded Walker was fit, reviewed Walker's penal/psychiatric records, which reveal that he had previously been treated and medicated for paranoid, psychotic episodes in various IDOC psychiatric units, and had been receiving SSI benefits since 1993, based on a diagnosis of schizophrenia. (Supp. C. 117-40, Supp. C. I, 25-61) Relying on these documents, Walker raised claims that there was a *bona fide* doubt of his fitness, and that his legal representatives had failed to provide effective representation by moving for a fitness hearing, or raising the issue of his fitness on direct appeal.

The court dismissed Walker's petition on the ground that Dr. Ferrell, who examined Walker in 2004 and 2005, could not reliably determine Walker's fitness at the time of the 1998 trial and sentencing hearings, or at the time the offenses occurred. (R. T11) The trial court was wrong. Walker's supplemental post-conviction petition made a substantial showing that Walker is severely mentally ill, that there was a *bona fide* doubt regarding Walker's fitness, and that counsel provided ineffective representation by failing to bring Walker's mental illness to the attention of the courts. Walker attached records from Chester and Tinley Park Mental Health Centers, where he was treated in the late 1980s for psychosis and paranoia. (Supp. C. 224-41) Walker was also prescribed antipsychotic medication to control his delusions. (Supp. C. 226-27) During his various periods of incarceration, Walker has inevitably landed in IDOC psychiatric units, suffering from paranoid psychotic episodes. IDOC psychiatrists diagnosed Walker with schizoaffective disorder and, on one occasion subjected him to an "emergency" regimen of antipsychotic medication. (Supp. C. 236)

Relying on Walker's psychiatric and penal records, neuropsychological testing, and a personal interview, psychologist Keenan Ferrell (whose report and affidavit were accompanied Walker's supplemental petition) concluded that Walker is a "severely mentally ill paranoid schizophrenic," and

that his mental illness should have been "glaring" to all of Walker's legal representatives, as well as the trial court. (Supp. C. I 4-5) Neuropsychological testing further revealed that Walker is mildly mentally retarded and has an "extremely low" I.Q. (Supp. C. 65) Walker may suffer from possible brain injury. (Supp. C. 66) Walker's persistent delusions regarding the FBI's desire to recruit him as an informant, reflected in Walker's comments as well as his letters to the trial court and sentencing counsel, are, according to Ferrell's report, quite common in schizotypal personality disorders. (Supp. C. 66)

The post-conviction court dismissed this information out of hand, apparently relying instead on the report of Forensic Clinical Services' Dr. Haidari Shikari, who examined Walker prior to his resentencing hearing and determined that Walker had "no mental disorder." (Supp. C. 586) Dr. Shikari's report is meaningless, because Shikari did not review any of Walker's psychiatric records and was utterly ignorant of Walker's past diagnoses of and treatment for paranoid schizophrenia. In Ferrell's opinion, Shikari's finding that Walker was fit for trial and sentencing was "likely erroneous[]," and deeply flawed, based on Shikari's "shoddy workmanship [and] disregard for [his] solemn duties," epitomized by his failure to obtain an accurate psychiatric history. (Supp. C. I 5)

Indeed, Shikari's report is seriously undermined by the findings of Forensic Clinical Services social worker Janine Bostick, who prepared a "Clinical Social Work Summary," also attached to Walker's supplemental petition. (Supp. C. 592) Bostick interviewed Walker's girlfriend Tracy Hayes, who reported that Walker:

1) had visual hallucinations about "people and dogs,"

2) talked to himself and heard voices,

3) had, at some point, "taken medication for his mind,"

4) had been in one, perhaps more, psychiatric hospitals and had likely participated in therapy sessions,

and

5) was receiving SSI benefits because something was "wrong with his mind."

(Supp. C. 592-95)

21

This information, which was apparently ignored by both Dr. Shikari and the post-conviction court, directly contradicts Dr. Shikari's conclusion that Walker had no significant history of mental illness. (Supp. C. 591) Bostick's interview with Walker's girlfriend should have alerted Shikari, and certainly the post-conviction court, to the distinct possibility that Walker was suffering from mental illness.

Walker also submitted an affidavit, stating that he informed his lawyers about his mental health history, but that they failed to investigate his claims. (Supp. C. 1029-30) Walker's petition is also supported by letters he wrote to sentencing counsel Marcella Lipinski, claiming that his life was in danger because of his informant activities, (Supp. C. 1044), and asking Lipinski to alert the judge that an unidentified law enforcement agency wanted him to help them. (Supp. C. 1044) Walker continued, "I have information that people get killed for. I did more work than any public agency would do!" (Supp. C. 1046) Walker's letters to appellate counsel (addressed to Public Pacifist Defender Lindsay Huge Judist) are notable for the nonsensical scribblings on the envelope, e.g., "GET THIS PICTURE AND KNOW WHY PICASSO PAINTED UPSIDE DOWN CATHOLIC WEB!" and "INSTEAD OF YAHTZEE LET'S PLAY NAZI." (Supp. C. 1025-24, emphasis in original) Walker's on-the-record outbursts, supplemented by written materials prepared by Walker, amply demonstrate that counsel should have moved for a fitness hearing, or, the case of appellate counsel, should have raised the issue of Walker's fitness to be tried and sentenced. These claims, likewise uncontradicted by the State, make a substantial showing that Walker's right to the effective assistance of counsel was violated by his representatives' failure to investigate and/or raise the issue of his fitness.

## IV. WALKER WAS "ACTUALLY UNABLE" TO FILE A TIMELY PETITION FOR HABEAS CORPUS RELIEF BECAUSE SERIOUS MENTAL ILLNESS AND EXTREMELY LOW I.Q. AFFECTED HIS ABILITY TO COMPLY WITH THE TIME LIMITS.

Walker's petition for writ of habeas corpus should not be dismissed based on timeliness because Walker was actually unable, by reason of mental illness, to file the petition on time. Immediately after being sent to the Illinois Department of Corrections for the instant offense, in August of 1999, Walker

Revised: 7/20/05

sought out a psychiatrist, requesting transfer to the psychiatric unit at Dixon. (Supp. C. 135) According to a report, Walker stated that everyone at Dixon is "left minded" and that prison officials administer medication to make him and everyone else "left minded." (Supp. C. 135) Walker stated that he may kill someone. The psychiatrist subsequently recommended that Walker be admitted as an emergency patient to the Dixon Psychiatric Unit because of possible "underlying paranoid psychosis." (Supp. C. 135) While at Dixon, Walker continued to refuse recommended psychotropic medications. (Supp C. 137) He also informed the intake psychiatrist that he had no history of psychiatric treatment and no prior contact with psychiatrists. (Supp. C. 138) A staff psychiatrist noted that Walker had "questionable delusions" and continued to monitor for a possible psychotic disorder. (Supp. C. 139) An evaluation dated September 13, 1999 describes Walker as "somewhat paranoid as well as delusional ... may decompensate into a more significant psychoses." (Supp. C. 137) The psychiatrist continued to monitor Walker for possible psychotic or delusional disorder. (Supp. C. 137)

Later, in 2001, Walker was once again sent to the Dixon Correctional Center for psychiatric treatment. Walker had been writing bizarre, unintelligible letters to the Stateville warden, "reflecting [] grossly disorganized thought processes." Walker again denied any history of psychiatric treatment. The examining psychiatrist diagnosed Walker with "psychotic disorder. (Supp. C. 118)

In November of 2001, Walker was placed on a "crisis watch" stemming from unspecified "agitated behavior." (Supp. C. 120) He was noted to be delusional and hostile, and continued to refuse to take psychotropic medications. The staff psychiatrist diagnosed Walker with schizoaffective disorder. (Supp. C. 120) Although Walker requested a transfer out of the psychiatric unit, the psychiatrists refused his request. (Supp. C. 133) In June of 2002, Walker finally agreed to take medication for his condition. (Supp. C. 126) He was prescribed Risperdal, an antipsychotic used for the treatment of schizophrenia. (Supp. C. 126) Walker showed improvement during the months he was on medication, but elected to stop taking the Risperdal in October of 2002. (Supp. C. 123) In January 2003, Walker reported having some problems with "voices," but stated that he could handle them without medication. (Supp. C. 169, 166) Walker's schizoaffective disorder was eventually characterized as having gone into remission.

Revised: 7/20/05

(Supp. C. 143-65)

Dr. Keenan Ferrell's report and affidavit, attached to Walker's supplemental post-conviction petition, detail Walker's diagnosis of paranoid schizophrenia and "extremely low" I.Q. (Supp. C. 4, 65) According to Ferrell, Walker's mental illness is characterized by severe paranoia, hearing of voices, and exercise of "extremely bad judgment," which, combined with deficient legal counsel, explain Walker's failure to timely file a post-conviction, and, by extension, a petition for habeas corpus relief. (Supp. C. 4-5) Further, because of his well-documented and severe mental illness, Walker could not have discovered the factual predicate for his claim until post-conviction counsel was appointed and gathered the documentation necessary to present his claims. This disputed issue, at the very least, requires an evidentiary hearing. Walker is claiming lack of fitness, an allegation supported by the record and extensive documentation. Thus, he should not be held to strict filing deadlines when it is possible he was not competent to appreciate these time limitations. The issue of Walker's mental state and its effect on his ability to file a timely petition for writ of habeas corpus, must receive an evidentiary hearing.

    2.   Have all grounds raised in this petition been presented to the highest court having jurisdiction?

        YES ( x )   NO ( )

    3.   If you answered "NO" to question (2), state briefly what grounds were not so presented and why not:

_____

**PART IV – REPRESENTATION**

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

   (A)  At preliminary hearing

_____

   (B)  At arraignment and plea

24

(C)  At trial:                                            Anthony Basile

(D)  At sentencing:                                  Anthony Basile (1st sentencing hearing)

     At resentencing:                                former Assistant Public Defender Marcella Lipinski
                                                           Judge, 6th Municipal District
                                                           Circuit Court of Cook County
                                                           16501 S. Kedzie Parkway
                                                           Markham, IL 60428

          (E)  On appeal                             Assistant Public Defender Lindsay Huge
                                                           Legal Resources Division
                                                           Cook County Public Defender's Office
                                                           69 W. Washington St., 15th Floor
                                                           Chicago, IL 60602

(F)  In any post-conviction proceeding:    Daniel J. Walsh
                                                           Legal Resources Division
                                                           Cook County Public Defender's Office
                                                           69 W. Washington St., 15th Floor
                                                           Chicago, IL 60602

(G)  Other (on appeal from dismissal of the post-conviction petition):

                                                           Kathleen M. Flynn
                                                           Assistant Appellate Defender
                                                           Office of the State Appellate Defender
                                                           203 North LaSalle Street - 24th Floor
                                                           Chicago, IL 60601

## PART V – FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES  (  )   NO  (x)

      WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be
entitled in this proceeding, including:

(1)  Issue a writ of habeas corpus ordering that Walker be brought before the Court to be discharged
     from his unconstitutional confinement and relived of his unconstitutional conviction and
     sentence;

(2)  Permit Walker, who is indigent, to proceed without prepayment of costs and fees;

(3)  Grant Walker, who is indigent, sufficient funds to secure expert testimony necessary to prove
     the facts alleged in this petition and sufficient funds to take necessary depositions;

I RANDY WALKER PRAY AND
PLEAD TO THE HONORABLE
FEDERAL COURT TO APPOINT
A ATTORNEY, MS KATHY
FLYNN OF THE COOK COUNTY
PUBLIC DEFENDERS OFFICE
HELPED ME TO PREPARE THIS
APPEAL. WHATEVER I STATED
TO MY ATTORNEYS DID NOT
MEAN ANYTHING TO THEM.
SPECIAL INV. MIKE PETERS
OF THE TINLEY PARK DIV.
OF THE FBI DO EXIST.
THIS FBI AGENT DID COME
SEE ME TWICE IN THE
COOK COUNTY JAIL, WE
TALKED ON THE PHONE
ABOUT SEVEN TIMES. I
WAS VIOLENTLY ASSAULTED
TWICE BEFORE MY TRIAL
IN CHAMPAIGN URBANA,
THERE ARE POLICE REPORTS
TO THAT FACT, I WAS
WORKING AS A INFORMER
FOR CHAMPAIGN URBANA

POLICE TO CAPTURE A
(QUINTIN MITCHELL)
QUINTIN MITCHELL SHOT
A NINE YR OLD BOY.
QUINTIN MITCHELL WAS MY
GIRLFRIEND NEPHEW.
QUINTIN MITCHELL WAS A
CLIENT OF MY ATTORNEY
ANTHONY J BASSALLO, THERE
IS ONE GOOD REASON
WHY NOBODY WANTED TO
CONTAC SPECIAL INV
MIKE PETERS OF THE FBI
IT WOULD PRODUE NEGLECT.
THE COOK COUNTY
INTERNAL AFFAIRS DIV
INTRODUCED ME TO THE
FBI AFTER I TOLD THEM
ABOUT MY TRIAL ATTORNEY
COCAINE ABUSE AND
DRUG RUNNING IN THE
COOK COUNTY JAIL. I
REPORTED THIS CRACK
ADDICTED ATTORNEY, THE
STATE OF ILLINOIS

COURTS ALLOWED THIS
ATTORNEY TO CONTINUE TO
PRACTICE LAW. JUDGES
AROUND THE STATE OF ILLINOIS
TOLD ANTHONY J BASSALLE TO
CHECK INTO A (REHAB)
(JUDGE BOLAN) TOLD MY
TRIAL ATTORNEY TO GET
HELP. EXCUSE ME FOR
SAYING THIS BUT THE
COURT WAS OUT OF ORDER
FOR THAT. COCAINE ABUSE
IS A CRIME, THIS WAS NOT
(ALCOHOL) THE ILLINOIS
   COURTS VIEWED MY
TRIAL ATTORNEY AS A
ECONOMICAL ASSET. IT
WAS IMPOSSIBLE FOR THE
CRACK ADDICTED ATTORNEY
TO PERFORM HIS DUTY
BECAUSE HE WAS A
CRIMINAL PRACTICING LAW.
SO HE DIDNT WANT TO
ANGER THE STATES
   ATTORNEY,

WHY DID NOBODY INVESTIGATE
THIS ATTORNEY? ALL OF HIS
CLIENTS WAS MINORITYS, HE
GOT ARRESTED 4 TIMES FOR
POSSESION. HE NEVER
SERVED A DAY. EVEN THOUGH
THE PUBLIC DEFENDER
OFFICE WAS AWARE OF THIS
ATTORNEY NEGLECT OF HIS
CLIENT" MR. LINDSEY HUGE
APPELLATE DEFENDER
IGNORED ANY KIND OF
LEGAL DEFENSE THAT
WOULD CAST A NEGATIVE
LIGHT ON THE ELECTION
HOPES OF MS. MARTHA CYPINSKI.
I CANNOT BELIEVE
MR. LINDSEY HUGE WAS
THIS INCOMPETENT, I
WROTE THIS ATTORNEY, HE
WOULD NOT WRITE BACK"
SO I WENT ON A
SUICIDE WATCH, I
JUST WANTED TO DIE.
AND THIS IS WHATS

WHATS WRONG WITH THIS
CASE" NOBODY INVESTIGATES
NOTHING. I WAS IN THE
COOK COUNTY JAIL" I WAS
TOLD TO CONTAC THE (FBI)
I TOLD THE COURT I WAS
(AFRAID) BUT THE COURT
CAUGHED. SO WHAT I
GOT PISTOL WHIPPED AND
BEAT WITH BATS. I DID
SHOW THEM MY SCARS
AND BRUISES. PLEASE I
BEG THIS COURT TO SEE
I WAS IGNORED AND
TREATED LIKE A ANIMAL.
PLEASE, THIS COURT CAN
GIVE ME MORE TIME IF
ANYTHING I'M SAYING IS
WRONG. I AM A 50 YR
OLD MAN WHO HAD TO
REFUSE MEDICAL
TREATMENT OF MY
MENTAL ILLNESS BECAUSE
OF MY INCOMPETENT
ATTORNEYS.

I GOT DOCTORS TELLING ME THE
FBI DON'T EXIST. THAT WHAT I
SAID HAPPENED IN CHAMPAIGN
URBANA DID NOT HAPPEN, SO
I REFUSED THERE MEDICATION,
I SUFFER EACH AND EVERY
DAY. NOBODY WANTS TO BE A
LIAR. THIS IS WHAT MY
LAWYERS LET ME BECOME,
ALL I ASKED FOR WAS
HELP. NOBODY WOULD GIVE
ME HELP. I DID NOT EVEN
GET THE BENEFIT OF
DOUBT, MY ATTORNEY STATED
THE COURT SHOULD HAVE
ORDERED A FITNESS
HEARING." WHAT EXACTLY
WAS THE ROLE OF THOSE
COURT OFFICIALS, WERE
THEY SUPPOSE TO JUST
LAUGH AT MY FBI STORY"
OR COULD A COMPETENT
STATES ATTORNEY CALL THE
FBI AND CHECK MY STORY
OUT.

WHAT ABOUT MY ATTORNEY
MS. MARSHA CYPINSKI, ALL SHE
HAD TO DO WAS CALL THE FBI,
MS. MARSHA CYPINSKI COULD
HAVE GOT THE POLICE REPORTS
IN CHAMPAIGN URBANA TO
PROOVE I WAS VIOLENTLY
ASSAULTED TWICE BEFORE
MY TRIAL" THAT MY LIFE
WAS IN DANGER. MS.
MARTHA CYPINSKI COULD
HAVE CALLED URBANA
CHAMPAIGN INV. TO FIND
OUT I WAS A INFORMER
ON A CASE INVOLVING THE
SHOOTING OF A NINE YR
OLD BOY, THE SHOOTER
WAS A (QUINTIN MITCHELL)
A CLIENT OF MY
TRIAL ATTORNEY ANTHONY
J BASSALLE, I BEGGED
MS MARTHA CYPINSKI TO
HELP ME, WHAT HARM
COULD IT DO TO CHECK
MY STORY OUT.

CASE # 80.CO4029
THE STATE MADE ME CLASS
X ELIGIBLE ON A 1985
(PROBATION VIOLATION)

I SERVED 3½ YEARS OF
PROBATION ON THIS CASE AND
SEVEN MONTHS COOK COUNTY
JAIL" I GOT NO CREDIT FOR
NONE OF THIS IN (1985)
AND NOW THE STATE USED
THIS CASE AGAIN FOR A 24YR
SENTENCE, I WAS 20 YRS OLD
ON THIS CASE, I CAN GO ON
AND ON ABOUT ILLEGAL
SENTENCES IN THE
ILLINOIS COURTS, I GOT FIRST
OFFENDERS PROBATION PRIOR
TO RECIEVING (30 YRS) THE
ILLINOIS        COURTS TAKE
FULL ADVANTAGE OF THE
MENTALLY ILL, I HAVE NO
VIOLENCE ON MY RECORD,
BUT VIOLENCE HAS BEEN
DONE TO ME.

PLEASE I BEG THIS COURT
TO APPOINT A (ATTORNEY)
I SWEAR THAT I AM
TELLING THE "TRUTH"

RESPECTFULLY
SUBMITTED

Mr Randy Walker

"OFFICIAL SEAL"
J. Karen Jones
Notary Public, State of Illinois
My Commission Exp. 06/05/2008